FILED

2016 Dec-02  PM 12:00
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA

ALABAMA AIRCRAFT )
INDUSTRIES, INC., ALABAMA )
AIRCRAFT INDUSTRIES, INC. - )
BIRMINGHAM, AND PEMCO )
AIRCRAFT ENGINEERING )
SERVICES, INC. )
)
     Plaintiff, )
)    CIVIL ACTION NUMBER:
v. )     2:11-cv-03577-RDP
)
THE BOEING COMPANY, )
BOEING AEROSPACE )
OPERATIONS, INC. AND BOEING )
AEROSPACE SUPPORT )
CENTER, )
)
     Defendant. )
)
)
THE BOEING COMPANY, )
)
     Plaintiff, )   Case No.: 2:16-mc-01216-RDP
)
v. )
)
TENNENBAUM CAPITAL )
PARTNERS, LLC )
)
     Defendant. )

## REPORT AND RECOMMENDATION

Before the Special Master are four (4) related motions, namely, (1)

Boeing's Motion to Compel the Production of Documents by Tennenbaum

Capital Partners ("TCP") (Doc. 1), (2) TCP's Motion to Quash Boeing's April 7, 2016 Subpoena (Doc. 6), (3) TCP's Motion to Strike Portions of the Declaration of J. Thomas Richie (Doc. 9), and (4) AAI's Motion to Quash Boeing's April 7, 2016 Subpoena (Doc. 3) (collectively, "the Motions" or "the TCP Subpoena Motions"), which were referred to the undersigned by Judge Proctor in an order dated August 16, 2016 (Doc. 40 at 1) in the matter of <u>The Boeing Company v. Tennenbaum Capital Partners, LLC</u>, Case No. 2:16-mc-01216-RDP.[1]

Prior to the matter's transfer to Judge Proctor, the Motions were extensively briefed in the Central District of California (*see* Docs. 3, 18, 28, 32, 33, 35); at Judge Proctor's behest (Doc. 40 at 2), the undersigned convened a telephone conference on August 23, 2016 to discuss with counsel for Boeing, TCP, and AAI whether such briefing was sufficient to allow the undersigned to properly resolve the Motions.  Counsel for TCP requested the opportunity to submit additional briefing as to the issue of cost sharing, but the parties were otherwise satisfied with the state of their briefing; however, by order dated August 26, 2016 (Doc. 41), the undersigned solicited supplementing briefing from the parties on the topic

---

[1] Judge Proctor's August 16, 2016 Order (Doc. 40) also encompassed a fifth motion, TCP's Motion for Sanctions and Cost Sharing (Doc. 8), but that motion has already been addressed separately in a Report and Recommendation filed by the undersigned on October 17, 2016 (Doc. 43).

of privilege waiver, which the undersigned identified as a threshold issue in resolving the TCP Subpoena Motions after a review of the existing record. The parties responded on September 23, 2016 by submitting briefs and exhibits regarding privilege waiver, and, in turn, by order dated October 3, 2016 (Doc. 42), the undersigned requested additional, waiver-related information from TCP.  TCP provided the requested information on October 10, 2016, and, as such, the Motions are now fully briefed, rendering them ripe for resolution.   For the reasons explained below, it is the recommendation of the Special Master that the TCP Subpoena Motions be **GRANTED IN PART**, **DENIED IN PART**, and **DEEMED MOOT IN PART**.

I.     **FINDINGS OF FACT**

   A.     **Underlying Subpoenas & Independent Production Agreement**

   1.     On February 18, 2015, Boeing served TCP with its first subpoena, issuing the document request out of the Southern District of California. (Doc. 3, Richie Dec. at Ex. 3).

   2.     Following TCP's objections to the court of issuance, Boeing re-issued the subpoena from the Central District of California, serving it on TCP on March 5, 2015. (Doc. 3, Richie Dec. at Exs. 4 & 5).

   3.     After extended negotiations over TCP's responsive obligations under the second subpoena (*see, e.g.*, Doc. 3, Richie Dec. at Ex. 10), the

parties entered into an independent production agreement in November 2015, pursuant to which TCP agreed to turn over certain documents in lieu of complying with the subpoena. (Doc. 3, Richie Dec. at Ex. 37).

4.      Ultimately, TCP produced more than twenty-three thousand (23,000) documents in connection with the agreement, turning over hard copy documents on November 30, 2015 and electronic documents on December 22, 2015. (Doc. 3, Richie Dec. at ¶ 24).  TCP also produced two privilege logs on January 19, 2016. (Doc. 3, Richie Dec. at Exs. 1 & 2).

### B.    Privilege Dispute, Third Subpoena, & TCP Subpoena Motions

5.      After receiving TCP's privilege logs, Boeing informally challenged the privilege assertions made therein, exchanging numerous letters with TCP on the issue. (Doc. 3, Richie Dec. at Exs. 12-15).  The parties were unable to resolve their privilege disputes, and, accordingly, Boeing filed a Motion to Compel on February 11, 2016 in the Northern District of Alabama. (Doc. 3, Richie Dec. at Ex. 40).

6.      Construing Boeing's Motion to Compel as an attempt to enforce the underlying subpoena (rather than the operative production agreement) (Doc. 3, Richie Dec. at Ex. 41), the Court applied Rule 45(d)(2)(B)(i) of the Federal Rules of Civil Procedure ("At any time, on notice to the commanded person, the serving party may move *the court for the district*

*where compliance is required* for an order compelling production or inspection.") (emphasis added), concluding that the Motion to Compel should have been filed in the Central District of California, as opposed to the Northern District of Alabama. (Doc. 3, Richie Dec. at Ex. 41—"The subpoena was served in California on a California company and seeks documents maintained in California.  Nothing in the discovery agreement alters Rule 45's tautological application here.").  Accordingly, it dismissed Boeing's Motion, but did so without prejudice, noting that "Boeing may file its Motion in the court issuing the subpoena (or another court which may have jurisdiction over TCP)." (Doc. 3, Richie Dec. at Ex. 41).

7.     On April 7, 2016, Boeing served a third subpoena on TCP, issuing it from the Northern District of Alabama. (Doc. 3, Richie Dec. at Ex. 22).  The third subpoena was much narrower than its two predecessors, seeking only those documents that appeared on TCP's privilege logs ("the Disputed Documents")[2] in an attempt to circumvent the jurisdictional issues

---

[2] The Disputed Documents consist of emails/email attachments containing legal advice from counsel for AAI that three former TCP partners/officers—Michael Tennenbaum, Mark Holsdworth, and Steve Wilson ("the TCP-based Outside Directors")—allegedly sent or received in their capacity as directors of AAI. (Doc. 3 at 17-18 (AAI)—"TCP withheld from that production privileged or otherwise protected documents that were in its possession because the documents had been received or sent by three of its former managing partners/officers: Michael Tennenbaum, Steve Wilson, and Mark Holdsworth.  These former TCP officers also served as members of AAI's board of directors by virtue of a TCP-managed fund's investment in AAI.  Because these TCP/AAI officers engaged in privileged and other communications related to their

that had previously plagued Boeing's efforts (*see supra* at ¶ 6) to compel production of the Disputed Documents. (*See* April 7, 2016 Letter from Boeing to Special Master—Doc. 3, Richie Dec. at Ex. 24—"As you know, TCP produced documents and two large privilege logs under the subpoena Boeing issued.  But when Boeing raised challenges to those privilege logs, TCP raised jurisdictional objections to Boeing's subpoena.  The objections relate solely to the court out of which the subpoena issued and is a wholly technical matter, *but for expediency we are simply issuing a revised subpoena rather than continue to dispute this point.*" (emphasis added); *see also* Doc. 3 at 12 (Boeing)—"To obviate TCP's new counsel's objection to Boeing's subpoena, Boeing issued a subpoena from the Northern District of Alabama on April 7.  It seeks only documents that were at issue under the prior subpoena, specifically the documents identified on TCP's privilege log." (internal citations omitted)).

8.     On June 24, 2016, Boeing filed two motions in the Central District of California, seeking to compel production of the Disputed Documents (Doc. 1) and/or transfer the enforcement proceedings to the Northern District of Alabama (Doc. 2).  TCP concurrently filed a number of

---

service on the AAI board while working at TCP, TCP has possession, custody, and control over privileged AAI communications and documents and thus has rightfully withheld them from their document production to Boeing.").

cross-motions—including a Motion to Quash (Doc. 6), a Motion to Strike (Doc. 9), and a Motion for Sanctions and Cost Sharing (Doc. 8)—and AAI also filed a Motion to Quash (Doc. 3).   Per local practice in the Central District of California, Boeing, TCP, and AAI submitted their briefing and evidentiary materials to the Court in a Joint Stipulation (Doc. 3).[3]

---

[3] TCP's Motion to Strike (Doc. 9)—which seeks to strike Paragraphs 9 and 12 of the declaration by Thomas Richie (counsel for Boeing) that was submitted with the Joint Stipulation (Doc. 3)—was not addressed in the parties' joint briefing materials.  Instead, the parties submitted separate briefs, namely TCP's Initial Brief (Doc. 9-1), Boeing's Response (Doc. 18), and TCP's Reply (Doc. 28).  In support of its Motion, TCP argued that Paragraph 9 ("Th[e] Special Master has ruled on numerous issues related to this motion, including . . .") amounted to "improper legal argument" because it offered "Mr. Richie's interpretation of various decisions by the Special Master" (Doc. 9-1 at 2). Likewise, in regard to Paragraph 12 ("TCP initially objected to [the first] subpoena because it issued out of the Southern District of California.  Counsel for Boeing asked counsel for TCP to state out of which district TCP contended the subpoena should issue.  The parties conferred regarding the matter and agreed that TCP's counsel would accept service of a subpoena issued from the Central District of California."), TCP argued that Richie lacked the personal knowledge necessary to support the paragraph's factual assertions. (Doc. 9-1 at 3—"Paragraph 12 of the Richie Declaration describes the content of conversations between counsel for Boeing and counsel for TCP, but Mr. Richie does not state that he was a party to these conversations . . . Because Mr. Richie has neither laid the proper foundation showing that he participated in these conversations, nor provided any evidence that he was a party to these conversations, he lacks personal knowledge to allow him to competently testify as to the substance of these conversations and the Court should strike this paragraph.").  In opposition, Boeing argued that there was "nothing objectionable in the brief descriptions contained in Paragraph 9," and further asserted that the paragraph was a non-issue because "those rulings speak for themselves" (Doc. 18 at 3); Boeing took much greater issue with TCP's Paragraph 12 argument, asserting that Richie's representation of Boeing provided him with sufficient personal knowledge (Doc. 18 at 4—"[T]he Richie Declaration in Paragraph 12 addresses the **substance** of the parties' **positions**, not the particular words used in a particular conversation.  By virtue of his representation of Boeing in this particular dispute, Mr. Richie has at all times had knowledge of TCP's litigation positions, and that knowledge is sufficient to support Paragraph 12 of his declaration.").

9.      Although many of the issues addressed by the parties in the Joint Stipulation are no longer relevant (*e.g.*, those relating to Boeing's Motion to Transfer or TCP's Motion for Cost Sharing), a number remain central to the Motions considered here, namely (1) timeliness, and (2) privilege.   Indeed, in attempting to quash Boeing's third subpoena, TCP and AAI primarily argued that the subpoena was untimely, as it was issued by Boeing after the discovery deadline in the underlying case. (Doc. 3 at 15 (TCP)—"With fact discovery closed in Alabama as of Februrary 29, 2016, and without a valid subpoena on which to move against TCP, on April 7, 2016 Boeing issued a third subpoena expressly targeting documents appearing on the privilege log TCP voluntarily provided with its production. The April 7 subpoena is fatally defective, as it was issued more than a month after the Alabama court's fact discovery cutoff."; Doc. 3 at 17 (AAI)—"Boeing's Motion should be denied and the TCP Subpoena quashed for two reasons: (1) because Boeing improperly issued and served this subpoena more than one month after the close of fact discovery in the Alabama Lawsuit, in violation of the Scheduling Order in that case; and (2) because the untimely subpoena expressly seeks the production of AAI's privileged or otherwise protected documents."; Doc. 3 at 17, n.4 (AAI)—"[I]t is not necessary for the Court to reach the privilege issues because

Boeing's Motion to Compel is due to be denied and the untimely TCP Subpoena quashed because it was served after the Alabama Lawsuit's discovery deadline.").   In addition to making a threshold timeliness argument, TCP and AAI also argued that Boeing's subpoena improperly sought privileged documents. (*See, e.g.*, *supra* at ¶ 7, n.2).  Boeing, in turn, pushed back on TCP/AAI's timeliness and privilege arguments, framing its third subpoena as a continuation of earlier, more timely discovery efforts and asserting that TCP's possession of the Disputed Documents resulted in a waiver of their AAI-based privilege. (Doc. 3 at 11 (Boeing)—"Their latest effort is to claim that Boeing's subpoena is untimely.   They are wrong.   This dispute began with a subpoena Boeing issued to TCP in March 2015, and every document at issue is responsive to that subpoena. The documents at issue were collected, reviewed, and logged by TCP at least by January 2016.   Although the scheduling order in the Underlying Action closed most fact discovery on February 29, 2016, all parties are well aware that several pending items were left open to continue past that date."; Doc. 3 at 24 (Boeing)—"[E]ven if the subpoenaed documents could have been privileged in AAI's hands, there is no possible basis for them to retain privileged status when all of the documents were *available* to TCP employees and attorneys to review and were *actually reviewed* by TCP's

attorneys.   TCP is a third party, and its possession and review of the subpoenaed documents breaks any possible privilege.").

10.    After entertaining the parties' motions at a hearing held on July 21, 2016 (Doc. 38), the California Court entered an order dated August 2, 2016 (attached hereto as Exhibit A),[4] which granted Boeing's Motion to Transfer and denied TCP's "Request for Cost Sharing" without prejudice.

### C.    Supplemental Briefing

11.    Following the matter's transfer, referral, and discussion by telephone conference (as described in the introductory paragraph above), the undersigned ordered the submission of supplemental briefing on the issue of privilege waiver, specifically requesting that the parties answer three waiver-centric questions: (1) What are the implications for purposes of waiver that result from the TCP-based Outside Directors' use of TCP email addresses to send and receive the Disputed Documents?; (2) Did the TCP-based Outside Directors have access to AAI email addresses?; and (3) What measures were taken by the TCP-based Outside Directors and/or

---

[4]   The Court's order appeared as Doc. 41 on the docket report of the Central District of California case, which was styled as 2:16-mc-00081-FMO-JPR.  However, the order appears to have been lost in the case's transfer, as it does not appear on the docket report of the instant case.  Accordingly, for ease of reference, the order has been attached hereto as Exhibit A.

TCP to protect the confidentiality of the Disputed Documents? (Doc. 41 at 5).

12.    The parties complied with the undersigned's briefing request on September 23, 2016. (*See* TCP's Supplemental Brief (attached hereto as Exhibit B), AAI's Supplemental Brief (attached hereto as Exhibit C), and Boeing's Supplemental Brief (attached hereto as Exhibit D)).  Expanding on its earlier position, Boeing argued that the Disputed Documents' exposure to TCP's email system resulted in broad waiver of both the attorney-client privilege and the work product doctrine. (Boeing's Supplemental Brief at 6—"It appears that neither Pemco nor its TCP-affiliated directors treated Pemco's privilege with anything close to the necessary respect and caution . . . [T]he putative privilege holder (Pemco) permitted its allegedly privileged communications to be shared with third party TCP by allowing its directors (Messrs. Tennenbaum, Wilson, and Holdsworth) to conduct their Pemco business using their TCP e-mail address, and, significantly, those communications were either stored on TCP's servers, or were otherwise found by TCP through a search of its documents.   All were thus unquestionably in TCP's possession, custody, and control and apparently available to ***anyone*** who could search TCP's system, without restriction."; *Id*. at 12—"Pemco waived [work product protection] when it voluntarily

disclosed those documents to TCP, which was initially a potential adversary during the term of its loan to Pemco and later became an actual adversary at Pemco's bankruptcy.").  In contrast, TCP/AAI argued that the Disputed Documents retained the protection of the attorney-client privilege and the work product doctrine, as TCP's email system contained sufficient confidentiality mechanisms and there was no adversity between TCP and AAI. (*See, e.g.*, AAI's Supplemental Brief at 2—"These privileged emails sent over TCP's email system were secure, protected, and maintained their confidential and privileged character when they were sent and received at TCP, when they were stored on TCP's servers, and when they were retrieved, reviewed, and logged in conjunction with TCP's document production to Boeing . . . Further, . . . disclosure of work product-protected materials to a non-adversarial and friendly party such as TCP does not waive the work-product protection associated with the document.").

13.   Despite their conflicting conclusions, the parties' briefs evidence agreement on a number of critical matters.  First, the parties agree that the TCP-based Outside Directors' use of TCP email addresses did not—without more—compromise the confidentiality of the Disputed Documents. (AAI's Supplemental Brief at 7—"Assuming a communication is otherwise privileged, the use of the company's email system does not

without more, destroy the privilege." (internal citations and quotations omitted); Boeing's Supplemental Brief at 6, n.7 & 12, n.12—"To be sure, the allegedly privileged communications between Pemco and those directors did not lose their privileged character merely because the directors happened to be TCP owners and officers and received emails at their TCP email addresses . . . To be clear, Boeing is not arguing that Pemco waived work protection merely by communicating with its directors on their TCP e-mail addresses.").  Second, the parties agree that the issue of confidentiality—and, thus, waiver—hinges on the question of whether AAI and the TCP-based Outside Directors sent, received, and stored the Disputed Documents on TCP's email system with an *objectively reasonable expectation of confidentiality*. (AAI's Supplemental Brief at 15—"*Because the AAI Outside Directors had a reasonable expectation of confidentiality and privacy in their TCP emails*  . . . there has been on waiver of privilege here." (emphasis added); Boeing's Supplemental Brief at 10—"To escape waiver it would have to prove that Pemco and the directors had an objectively reasonable expectation that allegedly privileged communications sent or received from their TCP e-mail addresses would remain confidential *from TCP* despite being in TCP's possession, custody, or control (either stored on its servers or otherwise).").  Finally, they agree

that such a question is best evaluated using the four-factor, *Asia Global* balancing test: "(1) does the corporation maintain a policy banning personal or other objectionable use, (2) does the company monitor the use of the employee's computer or email, (3) do third parties have a right of access to the computer or emails, and (4) did the corporation notify the employee, or was the employee aware, of the use and monitoring policies?" *In re Asia Global Crossing, Ltd.*, 322 B.R. 247, 257 (S.D.N.Y. 2005); (AAI's Supplemental Brief at 8 & 9—"*Asia Global* is considered the seminal case on the waiver issue . . . applying these four [*Asia Global*] factors, which numerous courts have found instructive . . ."; Boeing's Supplemental Brief at 10—"When assessing whether an employee has waived his or her own privilege by storing privileged communications on his or her employer's server (a slightly different context than that at issue here), many district courts (including those in the Eleventh Circuit) use the following four-factor framework . . . The same framework, however, should also apply to the facts we have here.")

14.   TCP's supplemental submission included a number of declarations that spoke to its policies and practices regarding the use and

monitoring of its email system (*i.e.*, the subject of an *Asia Global* analysis),[5]

but the submission did not include the exact language of TCP's use and

---

[5] *See, e.g.*, Declaration of Elizabeth Greenwood (TCP's General Counsel) at ¶¶ 11 ("Email accounts and computers at TCP are password protected, and TCP employees and management did not have general access to Mr. Tennenbaum, Mr. Wilson, and/or Mr. Holdsworth's emails."), 12 ("TCP's compliance department monitors the emails on the tennenbaumcapital.com domain for the purposes of ensuring compliance with the securities laws.  The compliance review . . . is not for review, recirculation, or dissemination of the contents of non-investment adviser activity-related emails."), & 13 ("TCP's information technology personnel had access to TCP email accounts for the limited purpose of network maintenance and other limited information technology purposes, [but] did not have permission or authority to review and monitor the content of Mr. Tennenbaum, Mr. Wilson, or Mr. Holdsworth's emails."); Declaration of Michael Tennenbaum at ¶¶ 11 ("As an owner of and partner in TCP, I was specifically aware of its very limited practices in monitoring my email for compliance purposes only and was also specifically aware that, as an owner and partner in TCP, I knew I was required to use my TCP email address to engage in communications, privileged or otherwise, related to my service on the Pemco board of directors."), 13 ("While I was a partner of TCP, to my knowledge, the only person authorized to have access to my TCP email address emails was the compliance officer, Liz Greenwood, for the limited purpose of regulatory compliance.  It is my understanding that, to comply with SEC-related audits of my emails, my emails would have been compiled into a batch by the TCP compliance officer, and then I would have reviewed that batch to remove any privileged emails from any internal or external review.  These privileged emails would have been identified by me and segregated from any investment-related emails.  Neither the SEC nor TCP's compliance personnel would have had authorization to review the content of any privileged emails."), 14 ("While it is my understanding that information technology personnel had access to my TCP email account for the limited purpose of network maintenance and other limited information technology purposes (as is necessary for the maintenance of any email system), they did not have permission or authority to view the content of my emails, particularly any Pemco-related emails."), 15 ("No one at TCP could access my TCP email account without my authorization . . . To the best of my knowledge, no other TCP personnel besides compliance or information technology staff to whom I gave authorization actually accessed my TCP email account."), 16 ("To the best of my recollection I did not verbally inform any non-Pemco employees or non-Pemco directors of the privileged contents of any Pemco email that I understood to be privileged.  In addition, I would not have taken any actions to waive the attorney-client privilege."), & 17 ("At all times when I sent an email or received an email involving counsel and Pemco, via my TCP email address, I had a full expectation of confidentiality and privacy in the sending, receiving, and storage of that email such that I understood that a confidential communication that was protected by the attorney-client privilege would remain privileged when sent, received, and/or stored by me on the

monitoring policies, which, according to the relevant case law, is a crucial element of a comprehensive *Asia Global* analysis.  As such, by order dated October 3, 2016, the undersigned requested that TCP submit "the exact, written language—if any—that makes up TCP's use and monitoring policies." (Doc. 42 at 3).  TCP did so on October 10, 2016,[6] rendering the Motions fully briefed and primed for resolution.

---

TCP email system . . . I understood that my emails related to my service on the Pemco board of directors that were sent, received, and stored on the TCP email system were private, confidential, protected from disclosure, and would remain so.").

[6] *See* January 1, 2006 Code of Ethics at 9 ("The Funds and the Advisors consider all information concerning their investment activities and the operations of those private companies in which it primarily invests to be confidential.  Access Persons . . . may not communicate that information to others who do not need to know that information in the interests of the Funds' business or are not permitted to receive such information under the Funds' confidentiality agreements with the companies in which they invest or consider investing.") & 10 ("The following are steps that can be taken to preserve the confidentiality of confidential information . . . (b) Access persons should not discuss confidential matters in elevators, hallways, restaurants, airplanes, taxis, or any place where they might be overheard. (c) Access persons should not leave sensitive memoranda on their desk or in other places where others can read them.  Access person should not leave a computer terminal without exiting the file upon which they are working. (d) Access persons should not read confidential documents in public places or discard them where others can retrieve them.  Access persons should not carry confidential documents in an exposed manner. (e) Access persons should not discuss confidential business information with spouses or other relatives or with friends. (f) Access persons should not permit clients or other visitors to a Fund or an Advisor to wander freely."); March 2006 Employee Handbook at 23 ("The Company's information systems, including but not limited to computers, voice mail, email and access to the Internet and World Wide Web, are provided by the Company for the use of the Company and are to be reviewed, monitored and used only in the pursuit of the Company's business.  As a result, certain date is readily available to numerous persons.  If, during the course of your employment, you perform or transmit work on the Company's computers or other technical resources, your work may be subject to the review of others.  You may access only files or programs that you have permission to enter.  Unauthorized review of files, dissemination of passwords, the creation or use of passwords not authorized by the Company, damage to systems, removal of files, removal of programs or improper use of information contained in any software or other

## II.    CONCLUSIONS OF LAW

For the reasons outlined below, it is the undersigned's legal conclusion that (1) the paragraphs targeted by TCP's Motion to Strike are irrelevant to the resolution of the remaining TCP Subpoena Motions, (2) Boeing's third subpoena (*i.e.*, the subject of Boeing's Motion to Compel, TCP's Motion to Quash, and AAI's Motion to Quash) constitutes a permissible continuation of timely, pre-deadline discovery efforts, and (3) the Disputed Documents were exchanged by AAI and the TCP-based

---

technical system or application may be grounds for disciplinary action, up to and including termination.") & 24 ("Searches of the Company's information systems may be conducted without advance notice in order to ensure that they are being used exclusively to facilitate transmittal of business-related information . . . As an employee of the Company, you are permitted to use the Company's equipment for occasional, non-Company-related purposes in accordance with Company policy. However, no personal right of privacy of an employee exists in any information contained within or transmitted by the Company's computers or voice mail or e-mail systems. Information contained on the Company's voicemail and e-mail systems are subject to review; Company management may override your voicemail, email, and computer passwords and review your messages or other data if deemed necessary in the best interests of the Company."); January 2009 Information Security Policies and Standards at 1 ("All information created or used in support of Tennenbaum Capital Partners business is considered company information. Company information will be protected from accidental, malicious or unauthorized disclosure, misuse, modification, destruction, loss and/or damage. Protection of company information must span the lifetime of the information."), 4 ("Controls must exist to ensure that users can only access data for which they are authorized."), & 15 ("Tennenbaum Capital Partners reserves the right to access, audit, and disclose all active and/or archived messages sent over its e-mail systems . . . All e-mail messages are considered Tennenbaum Capital Partners company records and property of Tennenbaum Capital Partners . . . Tennenbaum Capital Partners reserves the right to access, audit, and disclose all active and/or archived messages sent over its e-mail systems . . . Tennenbaum Capital Partners reserves the right to review electronic mail communications of employees to determine whether any breach of security or violation of company policy has occurred. Any individual who wishes to review e-mail messages for suspected violations must have the approval of the Director of Human Resources or his/her designate.").

Outside Directors with an objectively reasonable expectation of confidentiality.

### A.    TCP's Motion to Strike

It seems relatively clear that TCP's Motion to Strike was filed in an attempt to ensure that the California court was not influenced in its handling of the TCP Subpoena Motions by what TCP viewed as inaccuracies contained in the Declaration of Thomas Richie, *i.e.*, Paragraph 9 (which characterized prior rulings by the undersigned that were potentially relevant to the central issues of timeliness and privilege) and Paragraph 12 (which recounted an exchange between counsel for TCP and Boeing that was potentially relevant to the issue of timeliness).  However, given the Motions' current posture, such considerations have become irrelevant:  the undersigned is fully capable of determining whether his prior rulings are of any significance to the present Motions without referring to Paragraph 9, and the undersigned's timeliness conclusion, which is detailed below, does not turn on the exchange described in Paragraph 12.  Accordingly, TCP's Motion to Strike should be deemed moot.

### B.    Boeing's Motion to Compel/TCP's Motion to Quash/AAI's Motion to Quash

Resolution of the remaining TCP Subpoena Motions is primarily informed by two issues: timeliness and privilege.  Whether Boeing's third

subpoena was timely is a threshold issue, which, if resolved in the negative, would remove the need to address the issue of privilege, which is the core question presented by the remaining TCP Subpoena Motions. However, given the conclusion below that Boeing's third subpoena is a permissible extension of the parties' unimpeachably timely production agreement, the undersigned must grapple with the privilege conundrum, which is not suited for a clean and immediate determination.

### 1.   Timeliness

As noted above (*supra* at ¶ 9), the parties devoted considerable space in their initial briefing to arguments regarding the timeliness of Boeing's third subpoena, which was served after the February 29, 2016 discovery deadline established by the Court in its Amended Scheduling Order (Doc. 157).  Indeed, TCP and AAI framed the deadline as absolute (*see, e.g.*, Doc. 3 at 15 & 17), while Boeing couched the deadline in much less definite terms, arguing that the deadline was understood by all involved to permit the continued pursuit of outstanding discovery requests (*see, e.g.*, Doc. 3 at 11).

Given the Court's demonstrated willingness to entertain pre-deadline discovery disputes that have spilled beyond February 29, 2016 (*e.g.*, Boeing's May 6, 2016 "Motion to Compel AAI's Responses to Boeing's

Interrogatory No. 1 and Requests for Admission Nos. 6, 14, 15, 16, and 20"), the undersigned is inclined to adopt Boeing's approach, and, when combined with the fact that Boeing's third subpoena only seeks documents encompassed by the parties' timely production agreement, such an approach leads to the conclusion that the subpoena is an acceptable outgrowth of the underlying agreement, warranting consideration on the merits, *i.e.*, whether the documents requested by the subpoena are protected from disclosure by the attorney-client privilege and/or the work product doctrine.

### 2.   Privilege

Given the Disputed Documents' inclusion on the privilege logs produced by TCP (and, thus, TCP's acknowledgment that they fall within the parameters of the parties' production agreement), it appears that the only basis on which TCP can plausibly resist producing the Disputed Documents is by successfully defending their privileged status.[7]  This is an arduous task, requiring TCP to justify its privilege assertions on a document-by-document basis, *In re Grand Jury Subpoena*, 831 F.2d 225,

---

[7] As highlighted above (*supra* at ¶ 7, n.2), the underlying privilege theory advanced by TCP is that the Disputed Documents contain legal advice from counsel for AAI that three former TCP partners/officers either sent or received in their capacity as directors of AAI.  In other words, the alleged privilege belongs to AAI, but is being asserted by TCP on AAI's behalf.

227 (11th Cir. 1987) ("Blanket assertions of privilege before a district court are usually unacceptable . . . instead, [an attorney] must present himself with his records for questioning, and as to . . . *each* record elect to raise or not to raise the defense.") (emphasis *not* added); however, in light of TCP's possession of the Disputed Documents, the most pressing privilege issue is not whether TCP can demonstrate privilege on a document-by-document basis, but, rather, whether the attorney-client privilege has been waived as to all of the Disputed Documents, as TCP's third-party status potentially frustrates the privilege's requisite confidentiality. *In re Grand Jury Proceedings 88-9*, 899 F.2d 1039, 1042 (11th Cir. 1990) ("The attorney-client privilege exists to protect *confidential* communications between client and lawyer made for the purpose of securing legal advice.") (internal citation omitted) (emphasis added); *United States v. Gordon-Nikkar*, 518 F.2d 972, 975 (5th Cir. 1975) ("[A] client's and his attorney's communications are not deemed confidential when made in the presence of a third party.").

### i.    Waiver

As noted above (*see supra* at ¶ 13), the parties are in agreement that the issue of confidentiality—and, thus, waiver—hinges on the question of whether AAI and the TCP-based Outside Directors sent, received, and

stored the Disputed Documents on TCP's email systems with an "objectively reasonable expectation of confidentiality": if the Disputed Documents were exchanged/stored with such an expectation, then no waiver occurred; if, however, they were not, then the attorney-client privilege was waived.

The "objectively reasonable expectation of confidentiality" inquiry focuses on the email monitoring policies and practices of the third party at issue (*i.e.*, TCP), with such policies and practices being examined through the four-factor, *Asia Global* balancing test. *Asia Global*, 322 B.R. at 257 ("In general, a court should consider four factors: (1) does the corporation maintain a policy banning personal or other objectionable use, (2) does the company monitor the use of the employee's computer or e-mail, (3) do third parties have a right of access to the computer or e-mails, and (4) did the corporation notify the employee, or was the employee aware, of the use and monitoring policies."). The *Asia Global* test is most commonly utilized in the context of personal email use, where the question is whether the confidentiality of an employee's communications with his/her personal attorney have been compromised by their exposure to the employer's IT system; however, the test has also been successfully adapted to situations that approximate the present one, providing the undersigned with some

guidance in his application of the *Asia Global* factors to the information submitted by TCP regarding its email monitoring policies and practices. *See In re High-Tech Employee Antitrust Litigation*, 2013 WL 772668 at *6 (N.D. Cal. Feb. 28, 2013) ("In most [*Asia Global*] situations, an employee spoke with her personal attorney over her employer's email system.  Here, in contrast, Campbell [the Chairman of Intuit, who also served as a high-level consultant to Google] spoke with Google's employees and Google's counsel over Intuit's email system . . . Although the facts differ from the typical scenario, the court considers the method for determining whether the communications remained confidential basically the same.  To wit, did Campbell and Google have an objectively reasonable expectation of confidentiality in emails sent through Intuit's system?").  Applying the *Asia Global* factors to the present case, the undersigned concludes as follows:

### a.    Factor 1

According to *In re Information Management Services, Inc. Derivative Litigation* (a 2013 Delaware state court decision that applied the *Asia Global* factors in a particularly ordered and well-reasoned manner), "[the first *Asia Global*] factor has been refined to focus on the nature and specificity of the employer's policies regarding email use and monitoring.  It has been held to weigh in favor of production when the employer has a

clear policy banning or restricting personal use, where the employer informs employees that they have no right of personal privacy in work email communications, or where the employer advises employees that the employer monitors or reserves the right to monitor work email communications . . . This factor has been held to weigh against production if the employer does not have a clear policy or practice regarding personal use and monitoring." 81 A.3d 278, 287-88 (Court of Chancery of Delaware, Sept. 5, 2013).

Here, TCP's policies make clear that any information that passes through its IT system—such as the Disputed Documents—is considered company property, and they likewise reserve an unfettered right of review for the company. *See, e.g.*, January 2009 Information Security Policies and Standards at 1 ("All information created or used in support of Tennenbaum Capital Partners business is considered company information.") & 15 ("All e-mail messages are considered Tennenbaum Capital Partners company records and property of Tennenbaum Capital Partners . . . Tennenbaum Capital Partners reserves the right to access, audit, and disclose all active and/or archived messages sent over its e-mail systems . . . Tennenbaum Capital Partners reserves the right to review electronic mail communications of employees to determine whether any breach of security

or violation of company policy has occurred.").  However, TCP's monitoring policies seem primarily concerned with rooting out improper personal use (*see, e.g.*, March 2006 Employee Handbook at 24—"Searches of the Company's information systems may be conducted without advance notice in order to ensure that they are being used exclusively to facilitate transmittal of business-related information . . . As an employee of the Company, you are permitted to use the Company's equipment for occasional, non-Company-related purposes in accordance with Company policy.  However, no personal right of privacy of an employee exists in any information contained within or transmitted by the Company's computers or voice mail or e-mail systems."), and, as such, they largely fail to encompass the class of business-related communications to which the Disputed Documents belong.  Furthermore, the limited scope of TCP's monitoring practices (*i.e.*, only for purposes of securities compliance and IT maintenance) seems designed to protect the substantive confidentiality of communications by high-level employees. *See, e.g.*, Declaration of Elizabeth Greenwood (TCP's General Counsel) at ¶¶ 12 ("TCP's compliance department monitors the emails on the tennenbaumcapital.com domain for the purposes of ensuring compliance with the securities laws. The compliance review . . . is not for review, recirculation, or dissemination

of the contents of non-investment adviser activity-related emails.") & 13 ("TCP's information technology personnel had access to TCP email accounts for the limited purpose of network maintenance and other limited information technology purposes, [but] did not have permission or authority to review and monitor the content of Mr. Tennenbaum, Mr. Wilson, or Mr. Holdsworth's emails.").   Considering, then, that TCP's policies do not explicitly ban the type of behavior that the TCP-based Outside Directors engaged in with respect to the Disputed Documents, nor seem to be designed to monitor communications that resemble the Disputed Documents, this factor weighs in favor of finding that the Disputed Documents were exchanged and stored with an objectively reasonable expectation of privacy.

### b.   Factor 2

The second *Asia Global* factor—which "has been refined to focus on the extent to which the employer adheres to or enforces its policies," *i.e.*, "the employer's actual conduct with respect to monitoring"—likewise seems to favor a finding that the Disputed Documents were exchanged and stored with an objectively reasonable expectation of privacy. *In re Information Management*, 81 A.3d at 289.   Indeed, there is no evidence that TCP actually breached the confidentiality of the Disputed Documents (*cf.*

Declaration of Michael Tennenbaum at ¶ 15—"To the best of my knowledge, no other TCP personnel besides compliance or information technology staff to whom I gave authorization actually accessed my TCP email account."), and, as highlighted in the previous section, it was TCP's practice to avoid monitoring the substance of business-related communications like the Disputed Documents (*supra* at 25-26). Accordingly, this factor weighs against a finding of waiver. *See, e.g.*, *In re High-Tech*, 2013 WL 772668 at *7 ("In its Code of Conduct, Intuit reserves the right to 'inspect or monitor all company resources, assets and property at any time, without prior approval, knowledge or consent of employees to the extent allowed by law.' Intuit explicitly states that 'this includes monitoring and retrieving information that is stored or transmitted on Intuit's electronic devices, computers and systems.' . . . [However], [n]othing in the record before the court suggests that Intuit actually monitored its employees' emails or Campbell's emails in particular. The court finds the second factor thus weighs in favor of Google's expectation of confidentiality in the emails.").

### c.    Factor 3

The same cannot be said of the third *Asia Global* factor, which measures the third party's "right of access to the computer or emails." *Asia*

*Global*, 322 B.R. at 257.  TCP's policies clearly reserve its right to access any communications that are transmitted through the company's IT system (*see, e.g.*, January 2009 Information Security Policies and Standards at 15—"Tennenbaum Capital Partners reserves the right to access, audit, and disclose all active and/or archived messages sent over its e-mail systems."), and, accordingly, this factor favors a finding that the Disputed Documents were *not* exchanged with an objectively reasonable expectation of confidentiality.

### d.    Factor 4

Finally, the fourth *Asia Global* factor—which evaluates employee knowledge of employer policies—also favors a finding that the Disputed Documents were *not* exchanged with an objectively reasonable expectation of confidentiality.  Although there is some uncertainty as to the extent of the TPC-based Outside Directors' knowledge regarding TCP's policies, their elevated positions within the company effectively impute constructive knowledge to them, rendering any sort of detailed inquiry into their actual knowledge irrelevant. *In re Information Management*, 81 A.3d at 291-92 ("If the employee had actual or *constructive* knowledge of the policy, then this factor favors production because any subjective expectation of privacy that the employee may have had is likely unreasonable.") (emphasis added); *In*

re High-Tech, 2013 WL 772668 at *7 ("Because he was one of the highest level executives at Intuit at the time and because he admits familiarity with the policies, the court assumes that Campbell had at least constructive knowledge of the policies . . . This fourth factor thus weighs against a finding that Campbell had a reasonable expectation of confidentiality in his emails.").

On the whole, then, the factors are relatively balanced, largely split between those favoring waiver and those favoring confidentiality.  That being said, given the lack of evidence that TCP actually monitored the Disputed Documents, as well as the uniquely intertwined nature of the relationship between TCP and AAI, the undersigned concludes that the Disputed Documents were exchanged and stored with an objectively reasonable expectation of confidentiality, and, as such, no waiver of the attorney-client privilege occurred.[8]

---

[8] Boeing has also argued that TCP's possession of the Disputed Documents waived any potential work product protection (despite the work product doctrine's less pronounced emphasis on confidentiality), because TCP was an adversary of AAI. Boeing's Supplemental Brief at 12 ("[AAI] waived [work product protection] when it voluntarily disclosed [the Disputed Documents] to TCP, which was initially a potential adversary during the term of its loan to [AAI] and later became an actual adversary at [AAI]'s bankruptcy."); see, e.g., Niagra Mohawk Power Corp. v. Stone & Webster Engineering Corp., 125 F.R.D. 578, 587 (N.D.N.Y. 1989) ("Generally, the work product protection is waived when documents are voluntarily shared with an adversary or . . . when protected materials are disclosed in a manner which substantially increases the opportunity for potential adversaries to obtain the information.  However, sharing work product material with a friendly party does not waive the work product protection as it

## ii.      Supplemental Privilege Log

However, the undersigned's conclusion that no waiver occurred does not definitively resolve the overarching production question in TCP/AAI's favor.  Indeed, it is axiomatic that the attorney-client privilege and the work product doctrine can only be applied on a document-by-document basis, *supra* at 20-21, and, accordingly, TCP/AAI should be required to submit a supplemental privilege log that includes more specific assertions of the attorney-client privilege and/or the work product doctrine if they wish to continue to withhold the Disputed Documents on such a basis.

---

applies to an adverse third party.") (internal citations omitted).  At first glance, Boeing's argument is compelling; indeed, there was enough tension between TCP and AAI that Steve Wilson (*i.e.*, one of the three TCP-based Outside Directors) resigned from AAI's Board prior to its bankruptcy filing, citing a conflict of interest between his obligations to TCP and AAI. (Boeing's Supplement Privilege Brief at 7—"Mr. Wilson resigned from Pemco's Board before the bankruptcy due to a "conflict of interest" between Pemco and TCP's Special Value Bond Fund.").   However, the argument ultimately fails, as it is based on an improper use of the term "adversary": in the work product context, "adversary" is not some general designation, but, instead, is context-specific, referring to someone who is on the other side of the *same litigation* that is being anticipated by the work product. *See Hope For Families & Community Service, Inc. v. Warren*, 2009 WL 1066525 at *8 (M.D. Ala. April 21, 2009) ("The work-product doctrine 'protects from disclosure materials prepared by an attorney acting for his client in anticipation of litigation.'") (quoting *In re Grand Jury Proceedings*, 601 F.2d 162, 171 (5th Cir. 1979)); Charles Alan Wright, Arthur R. Miller, and Richard L. Marcus, *8 Federal Practice & Procedure* § 2024 (2d ed. 1994) ("[T]he purpose of the work product rule is not to protect the evidence from disclosure to the outside world but rather to protect it only from the knowledge of *opposing counsel and his client*.") (emphasis added and internal citations omitted).  As such, except in those instances where the work product doctrine is being applied to Disputed Documents that anticipate litigation between TCP and AAI, Boeing's argument is unavailing.

## III.    RECOMMENDATIONS

For the reasons outlined above, the undersigned recommends to the Court that the TCP Subpoena Motions be **GRANTED IN PART**, **DENIED IN PART**, and **DEEMED MOOT IN PART** as follows:

- TCP's Motion to Strike should be deemed **MOOT**.

- Boeing's Motion to Compel should be **DENIED** to the extent that it seeks immediate production of the Disputed Documents; however, Boeing's Motion to Compel should be **GRANTED** to the extent that the undersigned recognizes Boeing's entitlement to any Disputed Documents not protected by the attorney-client privilege and/or the work product doctrine.   Likewise, TCP's Motion to Quash and AAI's Motion to Quash should be **DENIED** to the extent that they seek the wholesale rejection of Boeing's entitlement to the production of the Disputed Documents; however, TCP's Motion to Quash and AAI's Motion to Quash should be **GRANTED** to the extent that they seek to establish that Boeing may be prevented from obtaining some or all of the Disputed Documents because such documents are potentially protected by the attorney-client privilege and/or the work product doctrine.   In order to facilitate a final resolution of the

parties' struggle over the Disputed Documents, TCP/AAI should be required to produce a supplemental privilege log **on or before December 23, 2016** that details the application of the attorney-client privilege and/or the work product doctrine on a document-by-document basis; any assertion of the work product doctrine, in particular, should be accompanied by an identification of the specific litigation that was anticipated in creating the document at issue.   If Boeing still wishes to challenge any of the renewed assertions, it may do so by filing specific, document-by-document challenges **on or before January 13, 2016**.  For those challenges aimed at an assertion of the work product doctrine, Boeing should detail (1) why the work product doctrine is inapplicable, or (2) why Boeing has a *substantial need* for the documents at issue and why Boeing cannot obtain the information contained in the documents at issue by other means without *undue hardship*.  After reviewing Boeing's challenges, the undersigned will conduct an *in camera* review of the Disputed Documents, if necessary.

Respectfully Submitted,


s/ David J. Middlebrooks
David J. Middlebrooks ASB- 8553-D58D


OF COUNSEL:
LEHR MIDDLEBROOKS VREELAND & THOMPSON, P.C.
P.O. Box 11945
Birmingham, Alabama 35202-1945
(205) 326-3002
Fax: (205) 326-3008


## CERTIFICATE OF SERVICE

I hereby certify that on December 2, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Counsel for Alabama Aircraft Industries, Inc., Alabama Aircraft Industries, Inc. – Birmingham, and Pemco Aircraft Engineering Services, Inc.

Counsel for The Boeing Company, Boeing Aerospace Operations, Inc. and Boeing Aerospace Support Center

Counsel for Tennenbaum Capital Partners, LLC


s/ David J. Middlebrooks
OF COUNSEL

537541